**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEVIN ROSE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WEBULL FINANCIAL LLC,<br><br>Defendant. | Case No. 1:26-cv-7784<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Devin Rose ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Webull Financial LLC ("Webull" or "Defendant"). Plaintiff, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action against Webull, a securities brokerage, for systematically misrepresenting to its customers the tax lot relief method (*i.e.*, the cost-basis methodology) that Webull applied to the execution and accounting of customer trades.

2. A "tax lot relief method" determines which shares of a security are deemed sold when a customer sells less than his or her entire position. Under the "First In, First Out" ("FIFO") method, the shares acquired earliest are deemed sold first. Under the "Last In, First Out" ("LIFO") method, the shares acquired most recently are deemed sold first.

3. The distinction between FIFO and LIFO is not merely cosmetic. For active traders, and particularly for the pattern day traders that Webull courts as its core customer base, the lot relief method determines which shares are relieved from the account upon a sale, which positions

remain open, the realized gain or loss generated by each closing transaction, the customer's resulting account equity, and the customer's consequent margin requirements and buying power. A day trader who opens and closes an intraday position in a security in which he also holds an older, longer-term position depends on LIFO to isolate the intraday trade from the older lot. If the brokerage instead applies FIFO, the sale is matched against the older lot, liquidating a position the customer intended to keep, generating realized gains or losses the customer never intended to realize, and distorting the customer's equity, profit-and-loss statements, margin calculations, and buying power.

4. To crystallize this, assume that a consumer buys 100 shares at $80 each, then later buys 100 more shares at $50 each, and then sells 100 shares for $70 each. Under LIFO, it is assumed the consumer sold the $50 shares and therefore reports a $2,000 gain on his or her taxes. Under FIFO, however, it is assumed the consumer sold the $80 shares and therefore reports a $1,000 loss. There are, of course, advantages and disadvantages to both methods. But ultimately, the decision to use LIFO or FIFO has a financial impact on consumers, as consumers make real-time decisions about trades based on the methodology they use. This is particularly so for day traders (*i.e.*, Plaintiff and other Webull customers) who focus on day-to-day fluctuations in the market rather than long-term investments. Thus, whether to use LIFO or FIFO is material to consumers.

5. Webull represents to its customers they may elect their preferred lot relief method by default, including LIFO, and that their elected default method will govern their trades going forward. Indeed, Webull represented to Plaintiff that Plaintiff's account was set to LIFO.

6. Those representations were false. As Webull ultimately admitted, Plaintiff's account was set to FIFO and "had always been FIFO" since the account was opened. Throughout

the intervening period, Webull executed Plaintiff's trades on a FIFO basis despite affirmatively assuring Plaintiff that LIFO was in effect.

7. Worse still, Webull's own support communications admit that, regardless of the lot relief method a customer selects, Webull calculates the realized profit and loss displayed to customers on its platform using a weighted average cost methodology, a *third method* that customers did not elect. In other words, Webull's customers elected one method, were assured it was in effect, but were shown results computed under a second or even third method.

8. The consequences of Webull's misconduct were significant. Because Webull applied FIFO (and weighted average cost accounting) to accounts its customers reasonably believed were governed by LIFO, customers' sales were matched against older, differently-priced lots, generating realized losses and reductions in account equity that the customers' intended trades would not have produced.

9. Plaintiff opened his Webull account with approximately $105,000. After trading through Webull's platform—while relying on Webull's false assurances that his LIFO election was in effect when, in fact, Webull was using a different method—Plaintiff's account was decimated to less than approximately $20,000.

10. Webull's conduct was knowing. Webull's employees repeatedly confirmed that Plaintiff's account was set to LIFO while Webull's own systems and records reflected, at all times, that the account was set to FIFO, a fact Webull ultimately conceded. Webull's scripted "estimate" deflections, its resort to undisclosed weighted average cost accounting, and its shifting explanations when confronted with trade-level arithmetic, demonstrate that Webull's misrepresentations were made with scienter and were part of a deliberate scheme, or at minimum a reckless course of business, that operated as a fraud on Webull's customers in connection with

the purchase and sale of securities.

11. Plaintiff brings this action on behalf of himself and a class of similarly situated Webull customers who elected the LIFO lot relief method (or another non-FIFO method) for their accounts and whose trades Webull nonetheless executed, matched, or accounted for using FIFO or weighted average cost methodologies.

## THE PARTIES

12. Plaintiff Devin Rose is a natural person who resides in California and has an intent to remain there, and is therefore a citizen of California. Plaintiff opened a brokerage account with Webull in or about August 2023 and, at all relevant times, maintained and traded through that account. Plaintiff's certification pursuant to the Private Securities Litigation Reform Act of 1995, setting forth Plaintiff's transactions in the securities at issue, is attached hereto and incorporated by reference herein.

13. Defendant Webull Financial LLC is a Delaware limited liability company with its principal place of business at 44 Wall Street, New York, New York 10005. Webull Financial LLC is a registered broker-dealer, a member of the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC"), and operates the Webull trading platform through which Plaintiff and the Class members placed the trades at issue. Webull Financial LLC acts as an introducing broker and clears customer trades through Apex Clearing Corporation ("Apex") on a fully disclosed basis.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because Plaintiff brings claims under a federal statute (the Securities Exchange Act of 1934), and the Court has supplemental jurisdiction over Plaintiff's related state-law claims

pursuant to 28 U.S.C. § 1367.

15. This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed class, and at least one member of the proposed class is a citizen of a state different from Defendant.

16. Defendant is an "unincorporated association" and is therefore "a citizen of the State where it has its principal place of business [New York] and the State under whose laws it is organized [Delaware]." 28 U.S.C. § 1332(d)(10).

17. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in New York.

18. Venue is proper in this District because Defendant resides in this District.

## FACTUAL ALLEGATIONS

### I. WEBULL'S BUSINESS AND ITS TARGETING OF ACTIVE DAY TRADERS

19. Webull offers self-directed securities brokerage services through its mobile applications and website. Webull markets itself as a sophisticated, low-cost platform for active traders, advertising "commission-free" trading, extended trading hours, advanced charting, and margin trading.

20. During the relevant time period,[1] Webull's marketing, product design, and revenue model target active traders and, in particular, pattern day traders ("PDTs"). PDTs are traders who execute four or more day trades within five business days in a margin account.

[1] At the time Plaintiff used Webull, a PDT was generally a margin-account trader who executed four or more day trades within five business days. That PDT framework was replaced in June 2026 by new intraday margin requirements.

21. Webull promotes its platform through social media influencers and paid promotions directed at the day trading community, and it competes directly with platforms such as E*TRADE, TD Ameritrade, Robin Hood, and Interactive Brokers for active-trader market share.

## II. THE LOT RELIEF METHOD GOVERNS REAL ECONOMIC OUTCOMES, NOT MERELY TAX REPORTING

22. Active traders depend on the ability to control which tax lots are relieved when they sell. When a trader holds an existing longer-term position in a security and separately trades that same security, the LIFO method ensures that the sale closes the newest lot, leaving the longer-term position undisturbed. FIFO, by contrast, forces the sale against the oldest lot, involuntarily liquidating the longer-term position and generating unintended realized gains or losses.

23. Because lot relief method selection is essential to active traders, the ability to elect LIFO is a material, competitively significant feature of a brokerage platform. Indeed, Webull allows its customers to select their *default* lot relief method (as Plaintiff did for LIFO), meaning that method will apply to all executions and trades moving forward. This is as compared to brokerages like E*TRADE that allow users to select the lot-relief method for every trade. Webull advertises this feature because Webull understands that active traders demand this capability and would take their business elsewhere without it.

24. The lot relief method applied to a customer's trades determines, *inter alia*:

(i) which specific shares are removed from the account upon a partial sale, and which remain;

(ii) the cost basis matched against each sale, and therefore the realized gain or loss generated by each closing transaction;

(iii) the customer's realized profit and loss ("P&L"), account equity, and Net Account Value;

(iv) the customer's margin-to-equity ratio, maintenance requirements, and exposure to Regulation T calls, maintenance calls, day trade calls, and PDT-related

restrictions;

(v) the customer's day trade buying power and overnight buying power; and

(vi) the customer's tax lot reporting to the Internal Revenue Service, which brokers are required by 26 U.S.C. § 6045 and the regulations thereunder to compute using the lot relief method elected by the customer.

25. A brokerage that applies FIFO to an account the customer has been told is set to LIFO does not merely alter a bookkeeping entry. It executes different economic transactions than the customer directed: it liquidates lots the customer intended to hold, realizes losses (or gains) the customer did not intend to realize, and reports account values, P&L, and buying power figures that do not correspond to the trading strategy the customer is actually attempting to execute. The customer, relying on those distorted figures, then makes further trading decisions, compounding the harm.

## III. WEBULL FALSELY AND REPEATEDLY REPRESENTED THAT PLAINTIFF'S ACCOUNT WAS SET TO LIFO

26. Plaintiff opened his Webull brokerage account in or about August 2023 with an initial investment of approximately $105,000.

27. Because Plaintiff is an active day trader who frequently day trades securities in which he also holds longer-term positions, the LIFO lot relief method was essential to Plaintiff's trading strategy. Plaintiff would not have opened or maintained an account with Webull, and would not have executed the trades at issue, had he known Webull would apply FIFO or another method to his account when Plaintiff affirmatively selected LIFO.

28. On or about September 22, 2023, Plaintiff contacted Webull to change his account's lot relief method to LIFO, explaining he wished to avoid liquidating older, longer-term positions when day trading. A Webull representative identifying himself as "Ryan" confirmed to Plaintiff,

in writing, that changing the tax lot setting "will change trade lot … (moving forward)"—*i.e.*, that the LIFO election would govern the matching of Plaintiff's trades going forward.

29. On or about January 31, 2024, in response to Plaintiff's further inquiry, a Webull support representative identifying herself as "Ran" explicitly confirmed to Plaintiff in writing: "Yes, your account's current tax lot was updated to LIFO."

30. Plaintiff received multiple additional confirmations from Webull, in writing and in redundant forms, that his account was set to LIFO and that his trades would be executed and matched on a LIFO basis. Plaintiff reasonably relied on these confirmations in continuing to trade through the Webull platform and in structuring his trades.

31. Each of these confirmations was false. Plaintiff's account was not set to LIFO. As Webull later admitted, Plaintiff's account set to FIFO and, had been at all times since the account was opened.

**IV. PLAINTIFF IDENTIFIED TRADE-LEVEL DISCREPANCIES THAT WEBULL COULD NOT AND WOULD NOT EXPLAIN**

32. Throughout the life of his account, Plaintiff observed persistent, material discrepancies between the results his trades should have produced and the results Webull reported. Trades that were demonstrable wins under Plaintiff's LIFO election were reported as losses, those losses were realized, and they reduced Plaintiff's Total Net Account Value and his available funds.

33. For example, on or about November 10, 2023, Plaintiff closed a position in Meta Platforms, Inc. ("META") that Webull's own platform displayed, in real time, as a gain of more than $100 at the moment Plaintiff placed the closing order. Webull reported the trade as closed at a loss of approximately $67. The market price of META did not and could not have moved sufficiently in the seconds between order entry and execution to account for that swing. The discrepancy is consistent with Webull matching the sale against a different, older and higher-cost

lot than the lot Plaintiff's LIFO election required.

34. On or about February 5, 2024, Plaintiff executed trades in Roku, Inc. ("ROKU") that, under the LIFO matching Plaintiff had elected and Webull had confirmed, should have produced a loss of approximately $64. Instead, Webull reported a realized loss of $1,061. When Plaintiff inquired, Webull explained that the loss had been calculated using an average purchase price that incorporated 500 ROKU shares Plaintiff had purchased months earlier, in December 2023, at a much higher cost basis of $95.99 per share. That is, Webull matched Plaintiff's sale against old lots (and averaged cost across lots), exactly what Plaintiff's LIFO election was intended to prevent. At the same time, Webull separately told Plaintiff that his Net Account Value had declined by only approximately $63 because of the trade, a figure irreconcilable with the $1,061 "realized" loss Webull simultaneously reported. Webull refused to clarify which figure actually affected Plaintiff's account equity.

35. On or about February 9, 2024, Plaintiff executed a standalone round-trip trade in Arm Holdings PLC ("ARM"), a trade with no prior open ARM position, that yielded a profit of approximately $5,000 based on the actual purchase and sale prices. Webull reported a realized P&L of only approximately $3,150. Webull's reported figure was derived by subtracting a cost basis of approximately $9,500, carried over from a previously closed, unrelated ARM position, from sale proceeds of $12,664.18. Webull thus deprived Plaintiff of approximately $1,850 in reported profit on a single trade by applying a cost basis from a position that had already been closed.

36. Also involving ARM, Plaintiff's cumulative LIFO ARM profits hovered consistently between $12,100 and $12,500 between February 8, 2024 and February 9, 2024. Plaintiff's ARM LIFO trading performance reached its peak on February 12, 2024 of $13,719.37.

However, Webull's forced FIFO matching on its backend showed a cumulative realized profit of only $1,317.38 on February 15, 2024. In other words, Webull's undisclosed use of FIFO cost Plaintiff $11,058.57 in trading profits on ARM that he should have earned under LIFO. This cash deficit triggered automated margin maintenance restrictions, overnight blocks, and account freezes that disabled Plaintiff's risk management tools and eventually forced the liquidation of his remaining positions at market bottoms.

37. On other occasions, Webull's realized P&L displays reflected inaccuracies exceeding $100,000 for a single trading day, and displayed open positions as negative (losing) positions when they were in fact profitable, preventing Plaintiff from making informed exit decisions in real time.

38. These trade-level discrepancies were not random errors. They were the systematic and mathematically predictable consequence of Webull applying FIFO matching and weighted average cost accounting to an account that Plaintiff had selected to be governed by LIFO, and which Webull had repeatedly confirmed was in fact governed by LIFO.

## V. WEBULL'S UNIFORM "ESTIMATE" DEFLECTION AND ITS ADMISSION OF UNDISCLOSED WEIGHTED AVERAGE COST ACCOUNTING

39. When Plaintiff raised these discrepancies with Webull and with supporting arithmetic, Webull deflected. Webull told Plaintiff that the P&L figures displayed on Webull's own trading platform were "only an estimate" and "for informational purposes;" that Plaintiff should instead rely on monthly statements generated by Webull's clearing firm; and, when pressed, offered complicated, shifting, and internally contradictory mathematical explanations that failed to reconcile the discrepancies.

40. Webull's "estimate" defense was itself deceptive. Webull markets its platform to day traders precisely on the strength of its real-time data and analytics. Day traders necessarily

make intraday decisions based on the platform's real-time displays. A monthly statement is useless for that purpose. Webull cannot simultaneously market real-time trading analytics to day traders and disclaim any responsibility for the accuracy of those analytics when they are shown to be systematically wrong.

41. Webull's use of weighted average cost accounting means that, as a structural matter, no Webull customer, whether electing FIFO, LIFO, or any other method, receives platform P&L reporting computed under the method the customer elected. The discrepancies Plaintiff identified were therefore not unique to Plaintiff's account: they were the uniform product of how Webull's platform is built.

## VI. WEBULL ADMITTED PLAINTIFF'S ACCOUNT WAS NEVER SET TO LIFO

42. After a period in which Plaintiff stepped away from trading due to his mounting and inexplicable losses, Plaintiff resumed trading on Webull and observed the same pattern: trades that should have been wins under LIFO reported as losses.

43. When Plaintiff inquired about one such trade, Webull first responded that the discrepancy was the result of an "internal error" on Webull's side and that the issue "had been fixed." It had not been: the loss remained reflected in Plaintiff's account. When Plaintiff pressed for clarity, Webull then conceded that the trade had been executed and matched on a FIFO basis, which is why it produced the loss.

44. On or about October 11, 2024, Plaintiff contacted Webull and asked a representative to state definitively whether his account was set to FIFO or LIFO. A Webull support representative identifying himself as "Myles" confirmed, in writing: "I can confirm that your current tax lot method is FIFO and has always been FIFO since you opened your account." At Plaintiff's request, Webull transmitted that confirmation to Plaintiff in both chat and email.

45. Webull's October 11, 2024 admission directly contradicted Webull's September

22, 2023 and January 31, 2024 written confirmations that Plaintiff's account had been set to LIFO, as well as Webull's multiple additional written assurances to the same effect. Either Webull's representatives repeatedly and falsely confirmed a LIFO setting that Webull's systems never implemented, or Webull's systems are incapable of implementing (or reliably recording) customer lot method elections at all. Either way, Webull's representations to Plaintiff that his account was set to LIFO, and that his trades would be executed and matched accordingly, were false when made, and Webull knew or recklessly disregarded that they were false, because Webull's own account settings and transaction records showed at all times the account was set to FIFO.

## VII. WEBULL'S MISCONDUCT TRIGGERED MARGIN CALLS, TRADING RESTRICTIONS, AND COMPOUNDING LOSSES

46. The artificial realized losses generated by Webull's undisclosed FIFO matching directly reduced Plaintiff's account equity and inflated his margin-to-equity ratio, repeatedly exposing Plaintiff to Regulation T ("RT") calls, maintenance calls, day trade calls, and related restrictions that Plaintiff's intended LIFO trading would not have produced.

47. Webull compounded this harm through inaccurate and inconsistent administration and disclosure of Plaintiff's buying power. Among other things, the Webull platform does not display a customer's overnight buying power ("ONBP") once it falls below zero, concealing from customers the existence and extent of a negative balance and forcing them to contact support to learn their true position. For instance, on or about September 28, 2023, a Webull support representative identifying herself as "Freya" informed Plaintiff that there was "no call amount" outstanding on his account. An RT call issued against Plaintiff's account the very next morning.

48. Webull also blocked Plaintiff from selling a META position due to an "RT restriction" even after Plaintiff's day trade buying power had been restored, warning that a sale would incur further violations, thereby forcing Plaintiff to hold a declining position and incur

additional losses. Plaintiff caught Webull assessing such calls and restrictions erroneously on several occasions, and Webull admitted such errors on several occasions.

49. The combined effect of Webull's conduct, falsely confirmed LIFO settings, FIFO matching, undisclosed weighted average cost reporting, improper cost basis carryovers from closed positions, unreliable real-time P&L displays, erroneous margin calls, and forced holding of declining positions, devastated Plaintiff's account, which fell from an initial value of approximately $105,000 to less than approximately $20,000.

## VIII. WEBULL'S CONDUCT IS SYSTEMIC AND CLASS-WIDE

50. Webull's misconduct is not unique to Plaintiff. Webull's admission that it computes platform-displayed realized P&L using weighted average cost—irrespective of the customer's elected lot method—establishes that the misreporting alleged herein is a structural feature of the Webull platform affecting every customer.

51. Webull's explanations of its conduct amount to further deception of its customer base: (i) Webull (or its clearing firm) lacks the operational capability to execute and match trades on a LIFO basis, yet advertises and confirms LIFO elections in order to attract and retain the active-trader customers who demand that capability; (ii) Webull possesses the capability but systematically fails to implement customer elections, while falsely confirming that it has done so; or (iii) Webull deliberately applies FIFO and weighted average methodologies notwithstanding customer elections because doing so benefits Webull. Under any scenario, Webull's representations to customers that their LIFO elections were in effect were false and misleading.

52. Webull profits from this conduct. Customers who observe unexpected losses trade more frequently to recover, generating additional order flow that Webull monetizes. That is, customers deposit additional funds to cure margin deficiencies created by artificial losses, increasing Webull's assets under management and margin lending, and Webull retains active-

trader customers it would lose if it disclosed that it cannot or will not honor LIFO elections.

## FRAUDULENT CONCEALMENT AND TOLLING

53. Any applicable statute of limitations has been tolled by Webull's knowing and active concealment of the facts alleged herein. Each time Plaintiff identified a discrepancy and inquired, Webull affirmatively misrepresented the state of Plaintiff's account (*e.g.*, falsely confirming the LIFO setting), mischaracterized its own reporting ("only an estimate"), attributed discrepancies to nonexistent or already "fixed" internal errors, and proffered shifting mathematical explanations designed to obscure rather than reveal the truth.

54. Plaintiff exercised reasonable diligence throughout: he monitored his trades, performed his own arithmetic, promptly raised discrepancies with Webull, and repeatedly sought written confirmation of his account settings. Despite that diligence, Plaintiff did not discover, and could not reasonably have discovered, that his account had never been set to LIFO until Webull's admission on or about October 11, 2024. Plaintiff and the Class Members' claims thus accrued, at the earliest, upon that admission.

## CLASS ACTION ALLEGATIONS

55. Plaintiff brings this action individually and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of the following class (the "Class"):

> All persons in the United States who maintained a Webull brokerage account for which a LIFO (or other non-FIFO) tax lot relief method was elected or confirmed by Webull, and who executed one or more sales of securities through the Webull platform during the applicable statute of limitations period.

56. Plaintiff reserves the right to amend the Class definition as the litigation progresses, including but not limited to through the use of subclasses.

57. Excluded from the Class are Defendant; its officers, directors, employees, and agents; its parents, subsidiaries, and affiliates; any judicial officer presiding over this action and

the members of his or her immediate family and judicial staff; and any person who timely and validly excludes himself or herself.

58. **Numerosity (Rule 23(a)(1)).** The members of the Class are so numerous that joinder of all members is impracticable. Webull has millions of funded customer accounts in the United States, and its customer base is disproportionately composed of the active traders to whom lot method election matters most. The identities of Class members are readily ascertainable from Webull's own account settings records, customer communications, and transaction data.

59. **Commonality and Predominance (Rules 23(a)(2) and 23(b)(3)).** There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members, including without limitation:

(i) whether Webull's representations and omissions regarding lot relief methods were materially false or misleading;

(ii) whether Webull acted with scienter, or knowingly or recklessly, in making the representations and omissions alleged herein;

(iii) whether Webull's conduct constitutes a device, scheme, or artifice to defraud, or an act, practice, or course of business operating as a fraud or deceit, in connection with the purchase or sale of securities, in violation of Section 10(b) and Rule 10b-5;

(iv) whether Webull's conduct breached its customer agreements and/or the implied covenant of good faith and fair dealing; and

(v) the appropriate measure of damages, restitution, and equitable relief.

60. **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all Class Members, elected (and received confirmation of) a LIFO lot relief method, executed trades through the Webull platform in reliance on that election and confirmation, and was subjected to the same undisclosed FIFO matching and weighted average cost accounting, arising

from the same uniform conduct, systems, and scripted customer support practices of Webull.

61. **Adequacy (Rule 23(a)(4)).** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other Class members, and Plaintiff has retained counsel experienced in complex consumer class action litigation who will vigorously prosecute this action.

62. **Superiority (Rule 23(b)(3)).** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members, while substantial in the aggregate, are small relative to the burden and expense of individual litigation against a well-capitalized brokerage. Further, individualized litigation would create a risk of inconsistent adjudications and would burden the courts. And this action presents no unusual manageability difficulties because liability turns on Webull's uniform conduct and Class Members' trades and account settings are recorded in Webull's own systems, permitting mechanical, records-based computation of each member's damages by comparing actual (FIFO/weighted average) outcomes to the outcomes the member's elected method would have produced.

## <u>CAUSES OF ACTION</u>

### <u>FIRST CAUSE OF ACTION</u>
### Breach of Contract

63. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

64. Plaintiff brings this claim on behalf of himself and the Class against Defendant.

65. This claim is pled independently of, and does not depend upon, any allegation of misrepresentation or scienter; it rests on Webull's failure to perform its contractual undertakings.

66. Plaintiff and each Class Member entered into a customer agreement with Webull governing their brokerage accounts. Pursuant to that agreement, the account settings functionality

Webull provided thereunder, and Webull's written confirmations of Plaintiff's and Class Members' lot method elections, Webull undertook a contractual obligation to apply the customer's elected lot relief method to the matching and accounting of the customer's trades.

67. Plaintiff and the Class Members performed their obligations under the customer agreement, including by funding their accounts, paying all applicable fees and margin interest, and placing trades in accordance with the agreement.

68. Webull materially breached its contractual obligations by failing to implement Plaintiff's and Class Members' LIFO elections; by matching and accounting for their trades on a FIFO and/or weighted average cost basis; and by failing to maintain accurate account records and reporting reflecting the customers' elected methods. Each trade matched contrary to the customer's elected method constituted a separate and continuing breach.

69. As a direct and proximate result of Webull's breaches, Plaintiff and the Class members suffered damages in an amount to be proven at trial, including without limitation the difference, computed trade by trade, between the realized outcomes Webull's actual matching produced and the outcomes the customers' elected methods would have produced, together with consequential damages from margin calls, restrictions, and forced liquidations proximately caused by the breaches.

**<u>SECOND CAUSE OF ACTION</u>**
**Breach Of The Implied Covenant Of Good Faith And Fair Dealing**

70. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

71. Plaintiff brings this claim in the alternative on behalf of himself and the Class against Defendant.

72. Every contract governed by New York law contains an implied covenant of good faith and fair dealing, pursuant to which neither party may do anything that has the effect of

destroying or injuring the right of the other party to receive the fruits of the contract.

73. Even if Webull's customer agreement did not expressly obligate Webull to implement customer lot method elections, Webull's provision of a lot method election feature, its confirmation of customers' elections, and the parties' reasonable expectations under the brokerage relationship gave customers the right to expect that Webull would honor confirmed elections and would provide account reporting computed in good faith. Webull's conduct, confirming elections it did not implement, applying undisclosed methodologies, and deflecting customer inquiries, deprived Plaintiff and the Class of the fruits of their agreements in bad faith.

74. As a direct and proximate result, Plaintiff and the Class suffered damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**Fraud**

75. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

76. Plaintiff brings this claim on behalf of himself and the Class against Defendant.

77. Defendant made material misrepresentations of presently existing fact to Plaintiff and the Class, including the written confirmations that their accounts were set to LIFO and that trades would be matched accordingly, and concealed material facts they were obligated to disclose, including that customer accounts remained set to FIFO, that trades were matched on a FIFO basis, and that platform P&L was computed under weighted average cost.

78. As a broker handling customer funds and executing customer securities transactions, and as the party with exclusive knowledge of and control over customers' actual account settings and its own internal methodologies, Webull had a duty to disclose these facts.

79. Defendant made these misrepresentations and omissions with knowledge of their falsity, or with reckless disregard for their truth, and with the intent that Plaintiff and the Class rely

upon them, specifically, to induce customers to open and maintain accounts, to continue trading, and to refrain from closing their accounts or pursuing remedies upon detecting discrepancies.

80. Plaintiff and the Class justifiably relied on Defendant' misrepresentations and omissions. Plaintiff, exercising diligence, repeatedly sought and received written confirmation of his LIFO election, and reasonably relied on those confirmations and on Webull's account reporting in continuing to trade.

81. As a direct and proximate result of Defendant' fraud, Plaintiff and the Class suffered damages in an amount to be proven at trial. Because Defendant' conduct was gross, wanton, and directed at the public generally as part of a pattern targeting Webull's customer base, Plaintiff and the Class are further entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class and the New York Subclass, respectfully requests that the Court enter judgment against Defendant as follows:

(i) Certifying the Class pursuant to Fed. R. Civ. P. 23, appointing Plaintiff as the class representative, and appointing Plaintiff's counsel as class counsel;

(ii) Awarding Plaintiff and the Class actual, compensatory, and consequential damages in an amount to be determined at trial;

(iii) Awarding punitive damages as permitted by law;

(iv) Awarding pre- and post-judgment interest at the maximum rate permitted by law;

(v) Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses as permitted by law; and

(vi) Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, individually and on behalf of the Class, demands a trial by jury of all issues so triable.

Dated: September 9, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Max S. Roberts*
Max S. Roberts

Joseph I. Marchese
Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jmarchese@bursor.com
mroberts@bursor.com

*Attorneys for Plaintiff*